UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| KELLEY GAINES,<br><br>　　　　　　　　　Plaintiff,<br><br>v.<br><br>GENERAL MOTORS, LLC,<br><br>　　　　　　　　　Defendant. | Case No.: 17cv1351-LAB (JLB)<br><br>**ORDER DENYING MOTION FOR LEAVE TO AMEND; AND**<br><br>**ORDER OF DISMISSAL** |

This putative class action arises from the sale of Cadillac SRX vehicles with allegedly defective sunroofs. In a substantial order (Docket no. 26), the Court granted Defendant General Motors LLC's (GM's) motion to dismiss, without granting Plaintiff Kelley Gaines leave to amend.

Ordinarily, leave to amend is granted unless the complaint cannot be saved by amendment. *Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1051 (9th Cir. 2008). Leave to amend is properly denied where the amendment would be futile, or where the amended complaint would be subject to dismissal. *Saul v. United States*, 928 F.2d 829, 843 (9th Cir. 1991). Gaines' untimely breach of express warranty claim clearly could not be salvaged. It appeared unlikely, though not certain, that the other claims could be successfully amended. The Court permitted Gaines to file a motion for leave to file a second amended complaint ("SAC"), and made clear it

would have to correct the defects the Court had pointed out. If the proposed amended complaint did not correct the identified defects, the Court would understand it to mean that she could not.

The Court directed Gaines to consider whether a class could be certified. The diversity and amount in controversy requirements under the ordinary diversity statute are obviously not met. The Court has jurisdiction — if at all — only under the Class Action Fairness Act (CAFA). Under Fed. R. Civ. P. 23(c)(1)(A), the Court is directed to determine class certification as early as practicable. *See also China Agritech, Inc. v. Resh*, 138 S. Ct. 1800, 1802 (2018). But more importantly, certification is necessary for the Court to be able to exercise jurisdiction. The Court must examine its own jurisdiction, *sua sponte* if necessary. *See Chapman v. Pier 1 Imports (U.S.) Inc.*, 631 F.3d 939, 954 (9th Cir. 2011) (en banc).

Because the Court pointed out particular defects, Gaines is expected to remedy those, unless she shows a reason why she cannot or should not be required to. Ambiguities, vagueness, or factual gaps that might be excused at an earlier stage are less excusable after they have been pointed out and she has been given opportunity to amend and correct them. *See Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 1007 (9th Cir. 2009) (quoting *In re Read-Rite Corp. Sec. Litig.*, 335 F.3d 843, 848 (9th Cir. 2003)) ("[W]here the plaintiff has previously been granted leave to amend and has subsequently failed to add the requisite particularity to its claims, '[t]he district court's discretion to deny leave to amend is particularly broad.'")

**Background**

The following facts are taken from the proposed second amended complaint ("SAC"). Gaines leased a model year 2010 Cadillac SRX around May of 2010, and apparently later bought it. Her car first experienced a sunroof leak on or around February 28, 2017, when she found the floorboard carpet soaked. Shortly after that, she took her car to be repaired. The padding between the firewall and

instrument panel assembly was saturated with water. The repair shop discovered that the right front sunroof drain hose was loose, and the right front sunroof drain was not seated in the grommet at the firewall. The shop ran an electrical system diagnostic, but Gaines does not allege any electrical repairs were made. The shop replaced both sunroof drain tubes and charged her $442.48. It also charged her $563 for removing, drying, shampooing, and cleaning the carpet. Gaines made an insurance claim, but still ended up paying the $250 deductible out of pocket.

Gaines seeks to represent a class of purchasers of model year 2010–2013 Cadillac SRX vehicles who experienced the Leaking Sunroof Defect and who were required to pay for repairs.

**The Defect**

The Court pointed out that Gaines had not clearly alleged that what she calls the Leaking Sunroof Defect was actually a single defect, as opposed to various different defects that could cause the sunroof to leak.

The SAC alleges that the defect is either a design defect or a defect in the manufacture of the sunroof and its component parts. (SAC, ¶ 2.) It alleges that the defect stems alternatively from three other defects. (*Id.*, ¶ 3.) In support of this, it attaches and cites to Exhibits 1–4, which are internal General Motors documents. (*Id.* at ¶¶ 3, 23–26.) The Court can, and does, consider these exhibits as part of the complaint at the pleading stage. *See Outdoor Media Grp., Inc. v. City of Beaumont*, 506 F.3d 895, 899–900 (9th Cir. 2007). Exhibit 4 documents a customer satisfaction program that was extended until February 28, 2017, but which excluded vehicles in California. (SAC, ¶ 26 and Ex. 4.) The chief effect of this document is to extend the program one month, from January 31, 2017 to February 28, 2017.

The Court ruled earlier on similar allegations (*see* Docket no. 26 at 5:12–6:2), and its analysis is just as applicable here. The exhibits the SAC again relies on make clear that the defect is not present in all cars, and that only some car

1  owners experience leaks. The defect (or group of defects) can have several
2  different causes, which the SAC includes in its pleading. But the exhibit it cites for
3  this proposition show that the causes are not the same in every car. The document
4  mentions only the most common causes of sunroof leaks, and they are listed in
5  the disjunctive, such that any of a number of problems can cause a leak. (*See* Ex.
6  1.) Some cars may have a void in the cowl seam sealer. In some, the front drain
7  hose grommet(s) may not be connected, or may not be fully seated, either in the
8  cowl panel or at the sunroof frame spigot. In some, the sunroof drain hoses are
9  misrouted, or are too short, and therefore display a higher level of tension which in
10 turn "may tend to cause a future disconnect or unseating of the grommet." The
11 document gives different instructions for repairing the problem, depending on
12 which of the various causes are behind the leak. These all appear to have different
13 causes (*e.g.*, too-short drain hoses used; drain hoses were misrouted when
14 installed; drain hoses may shrink due to temperature fluctuations; a gap is present
15 in the cowl seam sealer; or drain hose grommets were not properly connected or
16 seated, or have come loose.) Exhibits 3 and 4 document a subset of defects,
17 caused by drain hoses having shrunk due to temperature fluctuations.

The SAC summarizes this as "designed and/or manufactured with defective sunroof seals and/or sunroof drains" (SAC, ¶ 17) and claims that the same "component parts . . .and/or manufacturing technique" were used for all cars. (*Id.*, ¶ 4.) But this is contradicted by the exhibits, which show that some hoses were too short, some sealers had gaps, and other components were incorrectly assembled. In Gaines' own car, the drain hose was loose and the drain was not seated in the grommet at the firewall. (SAC, ¶ 53.) It is not clear whether this is the same defect documented in Exhibits 3 and 4.

Allegations that this constitutes a design defect are purely conclusory. It is clear the flaws are all manufacturing defects, not design defects. *See McCabe v.*
/ / /

4

*Am. Honda Motor Co.*, 100 Cal. App. 4th 1111, 1120 (Cal. App. 2 Dist. 2002) (defining design defect under California law).

Because GM has not challenged the treatment of this group of defects as a single defect, the Court will treat it as one for purposes of the complaint. But the defect can take various forms and have different causes, and because it is not present in all cars, or in the same form in the cars that have it. This is relevant to the amount in controversy.

**Jurisdiction**

### Amount in Controversy

The Court has addressed jurisdiction before, and must always do so whenever it comes into question. *See Chapman.*, 631 F.3d at 954. The Court explained early in this case that it was exercising jurisdiction under CAFA and that it could not exercise ordinary diversity jurisdiction. (Docket no. 20, at 2:16–18; Docket no. 26 at 4:21–5:4.) Although the Court already held there is no diversity jurisdiction and it is still clear there is none, the SAC continues to plead diversity as the sole basis for the Court's jurisdiction (SAC ¶ 44) and to allege that General Motors, LLC is a corporation. (*Id.*, ¶ 45.) It is apparent, however, that Gaines could try to rely on CAFA jurisdiction if she wanted to, so this order will address it.

The SAC never mentions an amount in controversy, and does not even include a conclusory allegation that the $5 million amount in controversy threshold for CAFA jurisdiction is met. Nor does it plead facts that could plausibly show that the amount in controversy is met.

The Court pointed out that Gaines failed to allege how many Class Vehicles were bought by putative class members, and when the alleged defects manifested in those vehicles (which would affect whether they were still under warranty). The SAC attempts to correct this. (Mot. for Leave to Amend, at 3:19–23.) The SAC defines "Class Vehicles" as 2010-2013 model year Cadillac SRX vehicles, and defines the class as everyone in California who purchased a Class Vehicle, as well

as everyone who purchased a Class Vehicle in California. (SAC, ¶¶ 1, 16.)) But the SAC continues to assert that the putative class consists of the same number of people as it did when the putative class was nationwide. Based on the total number of Class Vehicles sold or leased, it alleges the class consists of more than 222,000 people, *i.e.*, every owner of a Class Vehicle. (*Id.*, ¶¶ 40, 63.) Both based on the class definition and the Court's earlier rulings, class claims can only be brought by putative class members in California, or based on cars that were purchased in California. (*See generally* Docket no. 20 (denying leave to add claims by named out-of-state named plaintiffs).) The class is not nationwide, and the number of class members is clearly some fraction of 222,000.

The SAC alleges there are "tens of thousands, if not hundreds of thousands" of putative class members. (SAC, ¶¶ 40, 63.) It does not allege any basis for those numbers, but offers to amend after discovery; it does not seek discovery as to any other facts. While the "tens of thousands" figure is possible, there obviously cannot be hundreds of thousands of putative class members. Of the four versions of the Class Vehicles, one — the "Base" version — did not come with a sunroof and therefore could not have had the defect. More importantly, the sales figures are nationwide; Gaines cited the same figure when she was attempting to bring a nationwide class action. The only way the class can consist of over 220,000 people is if all Class Vehicles were purchased in California, or brought into California after being purchased. This allegation is unreasonable, and the Court does not accept it as true. *See Sprewell v. Golden State Warriors*, 266 F.3d 979, 988, *amended on denial of reh'g en banc*, 275 F.3d 1187 (9th Cir. 2001).

Of those Class Vehicles with the alleged defect, the SAC does not allege how many actually experienced a leak and resulting harm. It is clear not all cars actually experience a leak. (*See* Ex. 1 ("Some customers may comment on seeing a water leak . . . and/or finding the front carpet wet.")) And of those that experienced a leak that caused harm, the SAC does not allege how many GM denied warranty

coverage or free repairs under the express warranty or a customer satisfaction program. Leaks that materialized within 48 months or 50,000 miles would have been covered by the express warranty. (SAC, ¶ 20.) And at least some of the Class Vehicles were covered by a customer satisfaction program.[1] (*Id.*, ¶ 15 (recognizing that GM initiated a limited customer satisfaction program to provide repairs to some Class Vehicles).) Given that Gaines' allegations are based in part on public filings and reports (*Id.*, ¶ 13), she should have been able to base an estimate on those.

The SAC's conclusory allegations that the manufacturing defect (or group of defects) is present in every vehicle is not plausible in light of the document it cites and attaches. Even assuming every leak resulted in repair and related costs of around $1,000, as was the case with Gaines' car,[2] at least 5,000 Class Vehicles in California would have had to suffer a leak requiring repairs that GM did not cover before the jurisdictional threshold was met. Accepting, *arguendo*, that there are tens of thousands of Class Vehicles in California with the defect, the complaint does not reasonably show that the amount in controversy is met. *See Ibarra v. Manheim Investments, Inc.*, 775 F.3d 1193, 1197 (9th Cir. 2015) (CAFA jurisdiction cannot be based on "mere speculation and conjecture, with unreasonable assumptions").

The SAC also seeks declaratory and injunctive relief, which can contribute to the amount in controversy. *See Hunt v. Wash. State Apple Adver. Comm'n,* 432

---

[1] This could include cars purchased in California, then taken to a place where one of the customer satisfaction programs applied.

[2] Gaines has not pled any facts showing the full cost was covered by warranty, even though the Court pointed this out to her. For example, she does not cite warranty language showing that incidental damages (such as the cost of cleaning the carpet) are covered. (*See* Docket no. 26 at 6:18–19.) And it appears Gains is disclaiming recovery for amounts already paid by her insurance policy. So the $1,000 figure is a generous estimate of the costs that a putative class member might have incurred if the sunroof leaked.

7
17cv1351-LAB (JLB)

U.S. 333, 347 (1977). But for reasons discussed below, neither form of relief is available here. The claims for unjust enrichment and attorney's fees are derivative of other claims, which can only succeed if they do.

In short, the SAC does not plead the requisite amount in in controversy for CAFA jurisdiction. Even looking at other allegations to reason out what the amount in controversy, it is probably not met. Only with a good deal of optimistic conjecture could it be met, and precedent is clear this is not enough. Gaines' failure to invoke the Court's jurisdiction means this action cannot go forward in any event, even if she could state a claim.

**Possibility of Class Certification**

The Court's order pointed out that Gaines lacks standing to represent putative class members whose cars were covered by a customer service program or the "Cadillac Shield." (Docket no. 26 at 6:7–13.) Gaines cannot represent class members who might have claims arising from either type of coverage, and would be forced to abandon those claims. *See Taison Comm'cns, Inc. v. Ubiquiti Networks, Inc.,* 308 F.R.D. 630, 641–43 (N.D. Cal. 2015) (rejecting plaintiffs as adequate representatives based on their willingness to forgo damages in order to achieve class certification).

The SAC seeks to certify an "Injunctive or Declaratory Relief Class." (SAC, ¶ 61.) The Court already held that injunctive relief claims to prevent future violations were moot, nor is there any reason to suppose either Gaines or the class members would benefit from an injunction or declaratory relief. (Docket no. 26 at 10:1–10.) The SAC does not remedy this.

Even if some class members would benefit from either an injunction or declaratory relief, Gaines has no standing to represent them because her own claims for declaratory or injunctive relief are moot. *See Hodgers-Durgin v. de la Vina,* 199 F.3d 1037, 1045 (9th Cir. 1999) ("Unless the named plaintiffs are themselves entitled to seek injunctive relief, they may not represent a class

1  seeking that relief.") Her car has already been repaired, and there is no reasonable
2  likelihood she will be again injured by the leaking sunroof defect or GM's policies
3  regarding that defect, which was corrected in model years 2014 and later. *See*
4  *Lanovaz v. Twinings N. Am., Inc.*, 726 Fed. Appx. 590, 590–91 (9th Cir. 2018)
5  (holding that a plaintiff seeking injunctive relief must demonstrate a sufficient
6  likelihood that she will again be wronged in a similar way).

Although the Court directed Gaines to address the issue, the SAC shows no reasonable likelihood this action could be certified as a class action.

**Discussion of SAC Claims**

The Court dismissed Gaines' breach of express warranty claim with prejudice, and the SAC seeks to replace it with a breach of implied warranty claim. The SAC abandons the false advertising claim.

### Implied Warranty of Merchantability

The implied warranty only requires that a product be reasonably suited for its ordinary use. *Tae Hee Lee v. Toyota Motor Sales, U.S.A., Inc.*, 992 F. Supp. 2d 962, 980 (C.D. Cal. 2014) ("The basic inquiry . . . is whether the vehicle was fit for driving."). A product breaches this warranty only if it "did not possess even the most basic degree of fitness for ordinary use." *Mocek v. Alfa Leisure, Inc.*, 114 Cal. App. 4th 402, 406 (Cal. App. 4 Dist., 2003) ("[A] breach of the implied warranty of merchantability means the product did not possess even the most basic degree of fitness for ordinary use."). Gaines drove her car for about seven years before her sunroof began to leak, so it was obviously merchantable.

The statute of limitations for such a claim has also passed. *See Valencia v. Volkswagen Grp. of Am. Inc.,* 119 F. Supp. 3d 1130, 1141 (N.D. Cal. 2015) (holding that statute of limitations under Song-Beverly act requires implied warranty claims to be brought within four years of tender of delivery, not from the date the defect manifests). Any claim Gaines might have had for breach of implied warranty expired before she filed suit.

**Pleading Fraud and Misrepresentation**

The Court held that Gaines had not met Fed. R. Civ. P. 9's pleading standards for claims sounding in fraud. These include her claim under the California Consumer Legal Remedies Act (CLRA) and her claim under Cal. Bus. & Prof. Code §§ 17200, *et seq.* The Court has already rejected her contention that GM had an obligation to extend or expand the express warranty.

To state a claim for failing to disclose a defect, the plaintiff must allege the existence of both a defect and an unreasonable safety hazard, and a causal connection between them; and must allege that the manufacturer knew of the defect at the time the sale was made. *Williams v. Yamaha Motor Co.*, 851 F.3d 1015, 1025–26 (9th Cir. 2017). The SAC does not show that GM either knew about a defect when it leased the car to Gaines, or that it had a duty to disclose the defect for some other reason. *See Wilson v. Hewlett-Packard Co.*, 668 F.3d 1136, 1141–44 (9th Cir. 2012); *In re Sony Grand Wega KDF-E A10/A20 Series Rear Projection HDTV Television Litig.,* 758 F. Supp. 2d 1077, 1094 (S.D. Cal., 2010) (identifying two bases for a duty to disclose).

The SAC conclusorily alleges that GM must have known about the defect at the time it leased the car to Gaines in May of 2010. (SAC, ¶ 29; *see also* ¶ 32 (alleging either actual *or* constructive knowledge during the warranty period).) The SAC adds allegations that customer and dealer reports, and GM's own internal testing put it on notice of the defect, but these are both conclusory and devoid of any time references. (*See* SAC, ¶13.) Given that some of the basis for these allegations are public filings and records, Gaines should have been able to allege some facts, if they existed. Generalized contentions that GM must have known about the defect as a result of one or more of a combination of vaguely-identified factors are not enough to show that GM knew when it leased the car to Gaines that her car had the defect. At most, they might show GM had reason to suspect that some cars were defectively manufactured, which is unremarkable. The first

alleged fact showing GM was on notice of a problem was its initiation of a limited customer satisfaction program and issuance of internal service and repair bulletins in July, 2011. (SAC, ¶ 15.) The first specifically identified document was issued around August of 2013. (*Id.*, ¶ 23.)

The SAC's strongest argument for a duty to disclose would be if the defect posed an unreasonable safety risk and GM knew about it at the time it leased the car to Gaines, which the Court pointed out did not appear to be the case. (*See* Docket no. 26 at 8:16–9:4 (identifying pleading defects).) Gaines had not alleged that anyone was injured as a result of the defect, or that it was likely to create some kind of unreasonable safety hazard. The SAC attempts to correct this by adding numerous allegations about what could happen, and then alleging that it does happen, without saying how often (if ever) it does.

Some safety risk is not enough to trigger a duty to disclose under the CLRA; rather, the risk must be unreasonable. See *Williams*, 851 F.3d at 1029. The risk need not have caused harm, as long as the nexus between the defect and the alleged safety issue is close. *Id.* at 1028. But "allegations of an unreasonable safety hazard must describe more than merely 'conjectural and hypothetical' injuries." *Id.* (quoting *Birdsong v. Apple, Inc.*, 590 F.3d 955, 961 (9th Cir. 2009).

A water leak in a car is not itself dangerous. In other cases where similar water leak defects have been accepted as unreasonable safety risks, generally the leak is known to have caused a dangerous malfunction, or the complaint has alleged other supporting facts showing that the risk of harm was substantial. In *Cholakyan v. Mercedes-Benz USA, LLC*, for instance, the water leaks were known to be capable of causing electrical faults that could cause engine failure while the car was in operation. 796 F. Supp. 2d 1220, 1236 (C.D. Cal., 2011) (citing technical service bulletin acknowledging that the leak in question was in some cases accompanied by electrical faults, and allegations that the systems in question could cause sudden and unexpected engine failure). In *Marsikian v. Mercedes*

*Benz USA, LLC*, "many vehicles [had] suffered substantial electrical failure due to water damaging the computer, electrical system, and other components." 2009 WL 8379784 at *1 (C.D. Cal., May 4, 2009). Speculative risks that depend on the malfunction occurring in particular circumstances are generally not enough to trigger a duty to disclose. *Smith v. Ford Motor Co.*, 749 F. Supp. 2d 980, 990–91 (N.D. Cal., 2010). *See also In re Ford Tailgate Litigation*, 2015 WL 751772, at *11 (N.D. Cal., Nov. 25, 2015) (holding that an attenuated chain of causation did not demonstrate an unreasonable safety hazard). This is particularly true if the only known injuries are minor. *Avedisian v. Mercedes-Benz USA, LLC*, 43 F. Supp. 3d 1071, 1078–79 (C.D. Cal., 2014). Here, there are no known injuries.

The SAC alleges that water intrusion into electronic components could cause the car's rear hatch to malfunction such that it could open or close unexpectedly; could cause windshield wipers to fail; and could cause the dashboard to either display false warning signals, flash on and off, or display the car's speed as zero. (SAC, ¶¶ 7, 13.) It alleges that the cars may lose power and not start, leaving drivers stranded; or that the cars may not be able to be turned off. (*Id.*, ¶¶ 8, 9.) It also alleges that water leakage promotes the growth of mold, mildew, bacteria, and other organisms that could pose a respiratory hazard. (*Id.*, ¶ 10.) The SAC avoids saying how often any of these things might be expected to happen. It never alleges any of these things have happened, either to Gaines or anyone else. Nor does it allege any other facts suggesting they are anything other than speculative.

Beginning in January of 2015, well after Gaines leased her car, the bulletins the SAC cites and relies on mention the possibility that various interior components could be damaged by water, two of which are wiring and electronics. But, unlike the bulletin in *Cholakyan*, they do not say this has happened or that the risk is substantial.

Bearing in mind that Gaines cites public filings, reports, and other data she says put GM on notice of the risk (SAC, ¶ 13), she should have been able to allege

some of these facts, if they existed. *See Williams*, 851 F.3d at 1028–28 (failure to allege that any customer experienced a fire was "notable," in light of the large number of products alleged to have the safety hazard). Furthermore, the various malfunctions alleged here, while potentially dangerous under the wrong circumstances, are not comparable to sudden engine failure while driving or other similarly catastrophic malfunctions. *See, e.g., Smith v. Ford Motor Co.*, 749 F. Supp. 2d 980, 990–91 (N.D. Cal., 2010) (contrasting hazards posed by defective ignition lock with hazards caused by sudden loss of steering, and wheel failures).

Gaines was not injured and never experienced a safety problem. She was prompted to bring her car in for inspection when she found the carpet was soaked. When the shop inspected her car, they found the padding between the firewall and instrument panel assembly was wet or water-saturated. Although the shop ran an electrical system diagnostic, nothing seems to have been wrong with her car's electrical system. Nor does the SAC allege anyone else was injured, or that any of these things actually happened to anyone else — or that even if they did, GM knew about it. Assuming they did happen, the SAC is devoid of any allegations showing how often they happen, or what the risk is of any of them happening.

The chain of events required before a safety risk materializes is too attenuated here. Not only would the defect have to cause a leak, but the leak would have to cause wiring or electronics to fail, which in turn would have to cause a serious malfunction, which would have to occur suddenly and under the wrong circumstances. This is not to say the alleged defect did not pose a risk at all; rather, the risk shown is too speculative to amount to an unreasonable safety risk requiring disclosure. The SAC again fails to show that GM knew of and failed to disclose an unreasonable risk. The SAC also fails to plead enough other facts with particularity to satisfy Rule 9's pleading standard.

/ / /

/ / /

13

17cv1351-LAB (JLB)

**Unjust Enrichment and Attorney's Fees**

The SAC contends that GM unjustly enriched itself by concealing and failing to disclose the defect, thereby preventing owners from taking their cars in for inspection or repairs. The Court's earlier order pointed out that this claim is derivative of the SAC's other claims, and could only succeed if they do. The request for an award of attorney's fees under state statutes is also derivative of other claims.

Furthermore, unjust enrichment is a quasi-contract claim that depends on the absence of an express written contract covering the same subject matter. *Lance Camper Mfg. Corp. v. Republic Indemnity Co.*, 44 Cal. App. 4th 194, 203 (Cal. App. 2 Dist. 1996). Because there was a written contract covering the same subject matter (*i.e.*, the express warranty), this claim fails.

**Declaratory Relief**

The Court also pointed out that Gaines had not shown how declaring her rights concerning her car's formerly leaking sunroof would provide any meaningful relief. The SAC contends that a declaration will be useful because GM continues to deny payment for the cost of inspection and repairs, forcing class members to bear them. This claim is derivative of the SAC's other claims, and fails for the same reasons.

Furthermore, while a damages award would provide meaningful relief to Gaines, a declaration that GM should have paid for repairs (or should pay for them in future) would add nothing to this because this dispute will not recur. *See Campbell v. Murrietta*, 2015 WL 5997169, at *4 (C.D. Cal, May 22, 2015) (noting that declaratory relief is generally prospective, and should not merely duplicate a monetary damages award predicated on the same liability).

**New Allegations**

In addition to the new allegations already discussed, the SAC argues that the newly-discovered Exhibit 4 is significant in that it extended the customer

satisfaction program to February 28, 2017. Had she been living in one of the places where the program was in effect, she might have benefited from it — assuming that the leak occurred by February 28 and assuming it was caused by the drain hose having shrunk. But the program was in question was not a warranty, and did not cover Gaines' car. Even if GM voluntarily repaired other cars that experienced sunroof leaks around the same time, Gaines has never shown why it would have been obligated to expand the program to cover her car or other cars in California, or why the voluntary program should have been mandatory.

**Other Defects**

Earlier versions of the complaint have included vague or ambiguous allegations and theories, and Gaines was directed to address those. To the extent the SAC is still vague or ambiguous, the natural conclusion is that Gaines has not corrected those defects because she cannot. In other words, failure to amend appears to stem, not from neglect, but from the fact that the claim cannot be successfully pled.

The Court's previous order pointed out other defects in addition to the major ones this order has discussed. The Court has reviewed the SAC in light of its previous order, and has determined that the proposed amendments would not salvage it.

**Conclusion and Order**

Because the proposed SAC would again be subject to dismissal for reasons pointed out in this order and in GM's opposition, Gaines' motion for leave to amend is **DENIED**. Because the defects have already been pointed out to her, the Court concludes that further opportunities to amend would be futile. Furthermore, Gaines has failed to invoke the Court's jurisdiction; and the allegations strongly suggest she cannot do so, and that no class could be certified.

/ / /

/ / /

The SAC is therefore **DISMISSED WITHOUT LEAVE TO AMEND**. Gaines' claims are **DISMISSED WITH PREJUDICE** and the putative class's claims are **DISMISSED WITHOUT PREJUDICE**.

**IT IS SO ORDERED**.

Dated: March 17, 2020

Hon. Larry Alan Burns
United States District Judge